IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL ARMSTRONG,

    Plaintiff,

v.

BREAUX HOLDINGS LLC,

    Defendant.

Civil Action No.

1:24-cv-02042-SCJ-JKL

## <u>CONSOLIDATED PRETRIAL ORDER</u>

1.

There are no motions or other matters pending for consideration by the court

except as noted: Defendants shall file a motion to dismiss based on Rule 4 if this

case is not dismissed a week prior to trial.

*Plaintiff's position:  Defendant's Rule 4 Motion  has already been denied.*

**Defendant's Motion to Dismiss has been denied. Doc. No. [32] The Court has provided a schedule for filing other permissible motions. Doc. No. [40]**

2.

All discovery has been completed, unless otherwise noted, and the court will

not consider any further motions to compel discovery. (Refer to LR 37.1B). Provided

there is no resulting delay in readiness for trial, the parties shall, however, be

permitted to take the depositions of any persons for the preservation of evidence and for use at trial.

3.

Unless otherwise noted, the names of the parties as shown in the caption to this Order and the capacity in which they appear are correct and complete, and there is no question by any party as to the misjoinder or non-joinder of any parties.

4.

Unless otherwise noted, there is no question as to the jurisdiction of the court; jurisdiction is based upon the following code sections. (When there are multiple claims, list each claim and its jurisdictional basis separately.)

5.

The following individually-named attorneys are hereby designated as lead counsel for the parties:

| Party | Attorney |
|---|---|
| Plaintiff: | Amanda A. Farahany |
| Defendants: | Rhonda Kunkle |

6.

Normally, the plaintiff is entitled to open and close arguments to the jury.(Refer to LR39.3(B)(2)(b)). State below the reasons, if any, why the plaintiff should not be permitted to open arguments to the jury.

*No objection.*

2

The captioned case shall be tried (☒) to a jury or ( ) to the court without a

jury, or ( ) the right to trial by jury is disputed.

7.

State whether the parties request that the trial to a jury be bifurcated, i.e. that

the same jury consider separately issues such as liability and damages. State briefly the

reasons why trial should or should not be bifurcated.

*No objections. There are no issues to be bifurcated.*

*Defendant's Position:   Unless the court prefers to bifurcate the original petition*

*with the counterclaim.*

*Plaintiff's Position:   Defendant has not properly asserted a counterclaim.*

**There is no basis for bifurcation. Plaintiff may file a Motion to Dismiss the Counterclaim in
accordance with the scheduled contained in Docket Entry [40].**

8.

Attached hereto as Attachment "A" and made a part of this order by reference

are the questions which the parties request that the court propound to the jurors

concerning their legal qualifications to serve.

9.

Attached hereto as Attachment "B-1" are the general questions which plaintiff

wishes to be propounded to the jurors on voir dire examination. Attached hereto

as Attachment "B-2" are the general questions which defendant wishes to

be  propounded to the jurors on voir dire examination.

**The Court will collectively ask the jurors the qualifying questions set out in the Civil Trial Outline. Doc. No. [28-2], 3-4. Additionally, each juror will be asked to stand and answer the questionnaire that is set out in the Civil Trial Outline. Doc. No. [28-2], 4-5.**

10.

State any objections to plaintiff's voir dire questions: *Listed*

State any objections to defendant's voir dire questions: *NONE*

State any objections to the voir dire questions of the other parties, if any: *N/A*

11.

All civil cases to be tried wholly or in part by jury shall be tried before a jury consisting of not less than six (6) members, unless the parties stipulate otherwise. The parties must state in the space provided below the basis for any requests for additional strikes. Unless otherwise directed herein, each side as a group will be allowed the number of peremptory challenges as provided by 28 U.S.C. § 1870. See Fed.R.Civ.P. 47(b).

*No objections*

4

12.

State whether there is any pending related litigation. Describe briefly, including style and civil action number.

*There is no pending litigation.*

13.

Attached hereto as Attachment "C" is plaintiff's outline of the case which includes a succinct factual summary of plaintiff's cause of action and which shall be neither argumentative nor recite evidence. All relevant rules, regulations, statutes, ordinances, and illustrative case law creating a specific legal duty relied upon by plaintiff shall be listed under a separate heading. For each item of damage claimed, plaintiff shall separately provide the following information: (a) a brief description of the item claimed; (b) the dollar amount claimed; and (c) a citation to the law, rule, regulation, or any decision authorizing a recovery for that particular item of damage. Items of damage not identified in this manner shall not be recoverable.

14.

Attached hereto as Attachment "D" is the defendant's outline of the case which includes a succinct factual summary of all general, special, and affirmative defenses relied upon and which shall be neither argumentative nor recite evidence.

5

All relevant rules, regulations, statutes, ordinances, and illustrative case law relied upon as creating a defense shall be listed under a separate heading.

15.

Attached hereto as Attachment "E" are the facts stipulated by the parties. No further evidence will be required as to the facts contained in the stipulation and the stipulation may be read into evidence at the beginning of the trial or at such other time as is appropriate in the trial of the case.

16.

The legal issues to be tried are as follows:

Proposed by Plaintiff:

*Whether Breaux Holdings discriminated against Mr. Armstrong;*

**There is no cause of action for discrimination in this case.**

*Whether Breaux Holdings retaliated against Mr. Armstrong;*

*What damages Mr. Armstrong is entitled to, including compensatory and punitive damges.*

*Plaintiff disagrees with Defendant's position that a legal issue for trial can be based on the McDonnell Douglas framework or that there is a proper issue before the Court on attorney's fees against the Plaintiff by the Defendant.*

**At the August 6, 2025 Pretrial Conference, counsel for Defendant indicated that this legal issue is withdrawn by Defendant.**

6

<u>Proposed by Defendant</u>:

*Was Michael Armstrong fired or did he quit without providing notice, and without provocation?*

*Was Michael Armstrong falsifying his allegations against Matthew Devane Breaux and Breaux Holdings LLC?*

*Whether Micheal Armstrong planned and schemed to ruin the reputation of Breaux Holdings L.L.C. by making false allegation of racial discrimination and management inaction for an attempted payout.*

*Whether there is any proof at all of the allegations made by Micheal Armstrong regarding stating that co-worker called him the N Word on more than one occasion and whether Plaintiff subsequently told a decision maker, supervisor.*

~~*Whether Plaintiff can establish a prima facie case of racial discrimination?*~~

**Withdrawn by Defendant at Aug. 6, 2025 Pretrial Conference.**

*Whether the Employer intentionally discriminated against employee or was there a valid reason for employees' termination. Did the employer retaliate against the employee?'*

*Whether Michael Armstrong should pay damages, attorney fees, cost of litigation to Breaux Holdings L.L C.*

4912-8326-2554, v. 1

8.

Attached hereto as Attachment "F-1" for the plaintiff, Attachment "F-2" for the defendant, and Attachment "F-3", etc. for all other parties is a list of all the witnesses and their addresses for each party. The list must designate the witnesses whom the party will have present at trial and those witnesses whom the party may have present at trial. Expert witnesses, impeachment and rebuttal witnesses whose use as a witness can be reasonably anticipated must be included.

17.

Attached hereto as Attachment "G-1" for the plaintiff, "G-2" for the defendant, and "G3", etc. for all other parties are the typed lists of all documentary and physical evidence that will be tendered at trial. Prior to trial, counsel shall mark the exhibits as numbered on the attached lists by affixing numbered yellow stickers to plaintiff's exhibits, numbered blue stickers to defendant's exhibits, and numbered white stickers to joint exhibits.

18.

The following designated portions of the testimony of the persons listed below may be introduced by deposition: *See Last pages of this order. Listed for use for impeachment purposes.*

**Defendant may not introduce into evidence portions of Plaintiff's deposition as designated. See August 6, 2025 Order for instructions on use of depositions for impeachment. Doc. No. [40].**

*Plaintiff's Position: Plaintiff will be present at trial. Defendant cannot designate his testimony or introduce his testimony at trial. Plaintiff objects to its inclusion in the pretrial order.*

*Defendant's Position: Defendant shall have portions of Michael Armstrong deposition, 7-24-2025, presented for impeachment purposes as follows:*

Deposition clips attached under DEFENDANTS RESPONSE QUESTION 18

Any objections to the depositions of the foregoing persons or to any questions or answers in the depositions shall be filed in writing no later than the day the case is first scheduled for trial. Objections not perfected in this manner will be deemed waived or abandoned. All depositions shall be reviewed by counsel and all extraneous and unnecessary matter, including non-essential colloquy of counsel, shall be deleted. Depositions, whether preserved by stenographic means or videotape, shall not go out with the jury.

*Plaintiff objects to the introduction of Plaintiff's deposition testimony by Defendant.*

**Defendant may not introduce into evidence portions of Plaintiff's deposition as designated. See August 6, 2025 Order for instructions on use of depositions for impeachment. Doc. No. [40].**

19.

Attached hereto as Attachments "H-1" for the plaintiff, "H-2" for the defendant, and "H-3", etc. for other parties, are any trial briefs which counsel may

wish to file containing citations to legal authority concerning evidentiary questions and any other legal issues which counsel anticipate will arise during the trial of the case.

**Trial briefs are not required, but if a Party wishes to submit a trial brief, it shall be filed no later than August 19, 2025. No responses will be permitted.**

In the event this is a case designated for trial to the court with a jury, requests for charge must be submitted no later than **August 19, 2025.** Requests which are not timely filed and which are not otherwise in compliance with LR 51.1, will not be considered.

20.

If counsel desire for the case to be submitted to the jury in a manner other than upon a general verdict, the form of submission agreed to by all counsel shall be shown in Attachment "I" to this Pretrial Order.

> *Plaintiff agrees to a general verdict form.*
> *See Defendants proposed jury form. To be submitted*
> **Proposed Verdict Form due by August 19, 2025.**

21.

Unless otherwise authorized by the court, arguments in all jury cases shall be limited to one-half hour for each side. Should any party desire any additional time for argument, the request should be noted (and explained) herein.

> *Plaintiff requests 45 minutes for closing arguments.*

> *Defendant request 45 minutes for closing arguments.*

> **Each Party shall have 30 minutes for opening arguments and 45 minutes for closing arguments.**

10

22.

If the case is designated for trial to the court without a jury, counsel are directed to submit proposed findings of fact and conclusions of law not later than the opening of the trial.

23.

Pursuant to LR 16.3, lead counsel and persons possessing settlement authority to bind the parties met to discuss in good faith the possibility of settlement of this case. The court (☒) has not discussed settlement of this case with counsel. It appears at this time that there is:

( ) A good possibility of settlement.

( ) Some possibility of settlement.

( ) Little possibility of settlement.

(x) No possibility of settlement.

24.

Unless otherwise noted, the court will not consider this case for a special setting, and it will be scheduled by the clerk in accordance with the normal practice of the court.

4912-8326-2554, v. 1

25.

The Plaintiff estimates that it will require 1-2 days to present its evidence. The Defendant estimates that it will require 1.5 days to present its evidence. It is estimated that the total trial time is 3 days.

26.

**IT IS HEREBY ORDERED** that the above constitutes the pretrial order for the above captioned case ( ) submitted by stipulation of the parties or (X) approved by the Court after conference with the Parties.

**IT IS FURTHER ORDERED** that the foregoing, including the attachments thereto, constitutes the pretrial order in the above case and that it supersedes the pleadings which are hereby amended to conform hereto and that this pretrial order shall not be amended except by Order of the Court to prevent manifest injustice.

**IT IS SO ORDERED** this _7th_ day of _August_, 2025.

_____
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

4912-8326-2554, v. 1

Each of the undersigned counsel for the parties hereby consents to entry of the foregoing pretrial order, which has been prepared in accordance with the form pretrial order adopted by this court.

Respectfully submitted,

**BARRETT & FARAHANY**

*s/ Amanda A. Farahany*
Amanda A. Farahany
Georgia Bar No. 646135
2921 Piedmont Rd.
Atlanta, GA 30305
(404) 214-0120
amanda@justiceatwork.com

**RHONDA KUNKLE**

*s/ Rhonda Kunkle*
Rhonda Kunkle
Georgia Bar No. 078970
166 Anderson St Suite 226
Marietta, GA, 30060
(770) 881-1009
kunklelaw@yahoo.com

4912-8326-2554, v. 1

**The Court will collectively ask the jurors the qualifying questions set out in the Civil Trial Outline. Doc. No. [28-2], 3-4. Additionally, each juror will be asked to stand and answer the questionnaire that is set out in the Civil Trial Outline. Doc. No. [28-2], 4-5.**

Attachment A - Questions for Court to Propound on Jurors Re Their Legal Qualifications to Serve

Plaintiff's Questions to Jurors Regarding Legal Qualifications to Serve

1.

Do you have trouble reading, writing, speaking, or understanding the English language?

2.

Are you over the age of 18?

3.

Are you a citizen of the United States?

4.

Jurors for the Northern District of Georgia must reside in one of the following counties: Are you a resident of one of these counties?

5.

Have you resided in one of these counties for a period of at least one year?

6.

Do you have trouble seeing or hearing well? Do you have any other physical or mental health condition that would prevent you from serving as a juror in this case?

7.

This trial could take up to 3 days. Does that present a special problem for you?

8.

Have you read or heard anything about this case?

9.

Do any of you have a charge pending against you for the commission of, or have you been convicted in State or Federal Court of a crime punishable by imprisonment for more than one year, and if so, have your civil rights been restored?

10.

Do you know of any reason that you could not pass judgment in a case?

11.

Do you know of any reason that you could not apply the rules as they may be stated to you by the Judge?

12.

Are you or any members of your immediate family related by blood or marriage to Plaintiff Michael Armstrong?

13.

Do you or any members of your immediate family know Plaintiff Michael Armstrong?

14.

Are you or any members of your immediate family related by blood or marriage to Defendants?

15.

Do you or any members of your immediate family know Defendants?

16.

Are you related by blood or marriage to any of the attorneys in this case: Amanda A. Farahany, Constance Cooper, Rhonda Kunkle?

17.

Do you or any members of your immediate family know any of the attorneys in this case: Amanda A. Farahany, Constance Cooper, Rhonda Kunkle?

18.

Are you, or are any of your blood relatives, presently or in the past, an employee of Defendants?

4912-8326-2554, v. 1

**The Court will collectively ask the jurors the qualifying questions set out in the Civil Trial Outline. Doc. No. [28-2], 3-4. Additionally, each juror will be asked to stand and answer the questionnaire that is set out in the Civil Trial Outline. Doc. No. [28-2], 4-5.**

## Attachment B-1 - Plaintiff's Voir Dire Questions

## QUESTIONS FOR WRITTEN EXAMINATION

### 1.

Please state your full name.

### 2.

What is your spouse's name? Children's names and ages?

### 3.

What is your occupation?

### 4.

What is your spouse's occupation?

### 5.

Have you or a family member ever sued anyone? If so, please provide details.

### 6.

Have you or a family member ever been sued? If so, please provide details.

### 7.

Are you involved in any civic or volunteer organizations? If so, please tell us about them.

8.

Do you have any training in human resources, law or the legal field, and/or office work?

9.

How would you describe your political leanings: Very conservative, Conservative, Moderate, Liberal, Very Liberal, Other, or Prefer not to answer?

10.

Have you or a family member ever thought you had good reason to sue, but decided against it?

11.

Have you or a family member had any training or education regarding equal employment opportunity policies?

12.

Have you or a family member developed policies in the workplace, or been required to implement policies in the workplace?

13.

Do you own your own business, or have you owned your own business in the past?

4912-8326-2554, v. 1

14.

What news stations do you watch on TV, if any?

15.

Do you listen to any talk radio shows? Which shows do you listen to?

16.

Do you get news from the Internet? Which websites do you visit most often

for the news?

## PLAINTIFF'S GENERAL VOIR DIRE QUESTIONS

### 1.

In civil cases, the plaintiff has the burden to prove his case by what is called a "preponderance of the evidence." This means he must show that his claims are more likely true than not true. ~~This is often compared to a scale - if the evidence tips even slightly in favor of the plaintiff, he has met his burden.  Some people feel that "more likely true than not true" is not enough in a discrimination case, that they need more than just over 50% to find discrimination.  They feel like they would need to be 55, 60, 70 or even 80% sure before they could find for the Plaintiff.  Others are comfortable that if they think it probably happened, they have to find for the Plaintiff.  Which way do you lean, even just a little bit?~~

**Counsel may ask whether the jurors will follow the law with regards to the burden of proof.**

### 2.

Has anybody here heard about the Civil Rights Act of 1866?  What have you heard about it?

### 3.

This case involves allegations of racial discrimination in the workplace. Have any of you or any of your relatives or close personal friends ever experienced racial discrimination in the workplace?

4.

Have any of you ever witnessed racial slurs being used in the workplace?

5.

How would you feel about hearing testimony involving the use of racial slurs, including the N-word, in the workplace?

6.

Do you believe that the use of racial slurs – even once – is severe enough to create a hostile work environment?

7.

Have you ever worked in a restaurant or food service environment? If so, describe your experience.

8.

Have any of you ever been in a supervisory position where you had to address complaints of discrimination or harassment?

9.

When an employee complains about racial discrimination against another employee, some people believe that employee is doing the right thing. Others believe

that employee should mind their own business. Which view are you closer to, even a little? Why?

10.

Has anyone here ever lost a job after complaining about something they believed was wrong? Tell us about it. What were your expectations of your employer?

How long did it take after the complaint? Were you treated differently after the complaint?

11.

Have you ever been afraid to report wrongdoing at work because you were concerned about retaliation?

12.

Do you believe employees should be protected from retaliation when they report discrimination?

13.

Have you ever threatened to seek legal help regarding a workplace issue? What was the response?

22

14.

This is a case in which money damages are sought as compensation for racial discrimination and retaliation. Do you have any disagreement with our system of justice which provides that disputes such as this should be brought before a jury?

15.

Some people have trouble allowing money in their verdicts for things like emotional distress or mental anguish caused by racial discrimination. Others are okay with it. Which are you a little closer to? Why?

16.

Under what circumstances would you think it is appropriate to require a company to pay money as punishment for racial discrimination - instead of just to compensate someone for the harm they've experienced?

17.

Plaintiff is seeking damages in a significant amount. If you believe from the evidence that Plaintiff is entitled to recover such amount, would you have any hesitation about awarding a significant amount of damages?

4912-8326-2554, v. 1

18.

Have you previously served on a jury in either state or federal court involving employment discrimination? If so, please tell us about the case and whether the jury reached a verdict.

19.

Some people believe there are too many frivolous discrimination lawsuits. Others believe that lawsuits are necessary because it's the only place where an individual can stand up to discrimination. Which view are you closer to? Why?

20.

Does any member of the panel believe that the civil justice system should be changed to limit the ability of employees to bring discrimination claims against their employers?

21.

~~At the end of the trial, Judge Steve C. Jones will explain that you are required to decide what amount of money is appropriate based on whether the evidence shows my client's damages claims are "more likely right than wrong". You can have doubts on both sides, but when you weigh them all, if you think we're more likely right than wrong, you have to award damages accordingly. What trouble would you have, even~~

~~a little, making your decisions on the basis of whether we're more likely right than~~
~~wrong?~~

22.

~~In order to award damages, you only need to determine whether it is more~~
~~likely than not that the damages that the Plaintiff has asserted is the correct amount.~~
~~Please raise your hand if you would need more proof than that to award money to~~
~~the Plaintiff.~~

23.

Some people think you need more proof than just a person's word to decide a case. Other people think that, when no other evidence is available, a person's word, if they are believed, is enough. Which way do you lean, even just a little bit? Do you need more evidence than just a person's word?

24.

Have you had any prior experience with the legal system as a plaintiff or defendant? If so, what was the result? Were you satisfied or dissatisfied with the overall experience?

25.

Have you ever been a witness in any legal proceeding? What aspect were you a witness for? Were you satisfied or dissatisfied with the overall experience?

26.

Have you ever engaged the services of an attorney? Were you satisfied or dissatisfied with the overall experience?

27.

Have you or any member of your family attended law school, engaged in the practice of law, or worked in a law office?

28.

Are there any of you who yourselves, or any member of your immediate family, who has ever been a plaintiff or a defendant in any suit brought as a result of allegations of employment discrimination?

29.

Have you, a member or your immediate family, or a close friend, ever been a party to a lawsuit?

30.

Have you or any of your relatives or close personal friends ever been unjustly or unfairly accused of committing acts of discrimination in the work place?

31.

Have you, a member of your family, or a close friend, ever had occasion to file a charge of discrimination against any employer or with the Equal Employment Opportunity Commission?

32.

Have you or any of your relatives of close personal friends ever been involved in a legal dispute with a current or former employer?

33.

How many of you have ever terminated anyone for what you feel to be just or unjust reasons?

34.

How many of you are employers, supervisors, management etc.?

35.

At the end of this trial, if you think it will take just $50 to make up for what happened here – but if you know that the Plaintiff wants much more than $50 – what trouble would have you have ignoring what the Plaintiff wants and deciding on a verdict of only fifty dollars, if that's what you think is fair, in spite of feeling sorry for the Plaintiff?

36.

Now here's the other side of that question. If you decide it will take, say, twenty-five million dollars to make up for what happened to the Plaintiff, what trouble would you have – even a little – in deciding on a verdict like that if you thought it was fair, in spite of feeling sorry for the defendants, who'll want it to be much less?

37.

If you are a juror in this case, you will have some rights. It is extremely important that you understand these rights, and that you will exercise them as often as the need arises. First, you will have the right to hear all the testimony. So if a witness says something you don't hear, will you be comfortable raising your hand and telling the judge, "Your honor, I did not hear what the witness said." Will you do that?

38.

As you a juror you will have a second right: the right to understand the law. Nothing can be more important. But every so often during deliberations, jurors disagree over what the law is. Sometimes a juror is just not sure. And sometimes a discussion will start about what the law really is. So if any of that happens, instead of trying to decide among yourselves, will you be comfortable telling your

4912-8326-2554, v. 1

foreperson to knock on the jury room door and ask the bailiff to tell the judge there

is something about the law you need to hear about again?

### 39.

Do any of you work in the human resources department of any company?


OBJECTIONS TO PLAINTIFF VIOR DIRE


Plaintiff does not object to any Voir Dire Question not listed below.

OBJECTIONS

21. Objection to Voir Dire Plaintiff 21 This is not the Standard , Prejudice, misstated, misleading
    Not the legal standard will confuse jury    **Sustained**

22. Objection to Question 22 Judge Instructs Jury on correct standard and law    **Sustained**

37. Objection Judge instructs Jury not Lawyers of the law    **Overruled**

38. Objection Judge instructs Jury of the Law not lawyers.    **Overruled**

ATTACHMENT B-2 DEFENDANT'S VOIR DIRE QUESTIONS

**Attachment B-2 - Defendant's Voir Dire Questions**

1.

Have you ever made a claim of racial discrimination against an employer or co-worker?

2.

Have you or your spouse ever filed an EEOC claim for racial discrimination?

3.

Have you ever sought counsel regarding a claim of racial discrimination?

4.

Have you ever had a co-worker repeatedly threatening to sue their employer when speaking to fellow employees about racial issues?

5.

Does any juror believe that there are people who make up stories about racial discrimination to get money from employers?

6.

4912-8326-2554, v. 1

Does any juror think it possible that an employee could make up stories about racial slurs to get other employees fired or to get a settlement.

7.

Has anyone ever been in a position at work where you were targeted by another employee making false allegations about racial comments that could get you fired or reprimanded?

8.

Do you believe that workplace disputes involving racial language should be handled internally by management rather than through the courts?

9.

Have you ever worked in a restaurant or kitchen environment where strong language or heated exchanges were common?

10.

Do you believe that some employees ~~are~~ **can be** overly sensitive about workplace comments that may not have been intended as discriminatory?

11). Have you ever made a claim of racial discrimination against an employer or co-worker?

12). Have you or your spouse ever filed an EEOC claim for any reason?

13).Have you ever sought legal counsel?

14).Do you believe that there are some people who make up stories and scam others for money?

15.)Do you run a small business? Or have you ever owned a small business?

16).Do you frequent restaurants and eat out often?

17.)Has anyone ever been in a position at work where they were targeted by another employee?

18.) Have you ever worked in a restaurant or kitchen?

19.)Do you know anyone who hops/moves    from job to job? Do they lie about their previous employers?

20.)Do you know of, or you are a person, who cannot handle a high pressure work environment that is fast past and requires few errors?

4912-8326-2554, v. 1

### Attachment C - Plaintiff's Outline of the Case

To prevent harassment in the workplace, an employer must maintain and widely disseminate written policies regarding discrimination.  When a company receives a report of discrimination, it must investigate the report – not the person who reported it – to determine whether discrimination occurred.

An employer cannot terminate an employee because the employee raises a report of discrimination or threatens to sue the employer for not remedying the discrimination.

Michael Armstrong, a former employee of Breaux Holdings, LLC, sued for ~~harassment and~~ retaliation under 42 U.S.C. § 1981. Mr. Armstrong alleges that he was subjected to racial slurs in the workplace, including multiple uses of the N-word, that he complained about this treatment, and was subsequently terminated after threatening to seek legal assistance if the conduct was not addressed.  Breaux Holdings itself contends that a reason for Mr. Armstrong's termination was that he "threatened to (scheme to) sue employer", which is an illegal reason.

**Damages Sought:**

1. Declaratory Relief: An order from the Court declaring that Defendant ~~discriminated~~ **retaliated** against Plaintiff.

33

2. Injunctive Relief: Instatement to either Plaintiff's former position or an equivalent position; entry of a preliminary and permanent injunction prohibiting Defendant from future ~~discriminatory~~ **retaliatory** acts.

3. Special Damages: Back pay from the date Plaintiff was terminated until the time of trial, together with all raises and benefits to which the Plaintiff would otherwise have been entitled, seniority, and all benefits of employment.

4. General Damages for Mental and Emotional Distress and Loss of Professional Reputation in an amount to be determined by a jury

5. Punitive Damages in an amount to be determined by a jury

6. Attorneys' Fees and Costs: As authorized by 42 U.S.C. § 1988 post-verdict

### Attachment D - Defendant's Outline of the Case

From the filed pretrial order, Attachment D includes defendant's facts and defenses:

### ATTATCHMENT D- DEFENDANT'S OUTLINE OF THE CASE

**DEFENDANT'S ASSERTION OF THE FACTS:**

### ATTATCHMENT D- DEFENDANT'S OUTLINE OF THE CASE

**DEFENDANT'S ASSERTION OF THE FACTS:**

Michael Armstrong was hired by Breaux Holdings LLC d/b/a/ Birdies Wings on 12/5/2023. There is a text which documents this date.

Mr. Armstrong was hired in reliance on his INDEED application and the interview that reviewed his skills pursuant to his INDEED application.

Mr. Armstrong falsified and was untruthful about his previous employment in the hiring process and directly to the Hiring Manager by direct statement and omission.

He was scheduled for training on 12/8/23 and 12/9/23. He showed up to work on time and worked a full shift but was not yet allowed to cook.

He was scheduled to begin work on 12/13/23. Mr. Armstrong showed up to work. However, every shift he punched in after this date he was late. While employed he worked a total of 8.5 days plus two additional days in which he came in 1.5 hours each.

His entire scheduled spanned 20 days . He called in and did not work for 3 days. He quit on 1/3/2024, when he walked out.

His record reflects (3)  three scheduled days were no show 1/4/24, 1/5/24 and 1/6/24.

He was late on 9 days. He worked 2 (1) hour days leavin early on 12/23 and 1/3/24.  He left early from his shift on 12/20 by 4 hours.

On 1/3/24 Micheal Armstrong showed up an hour late, took a video and argued with the General Manager about doing his job and what he should be doing.

On 2/28/2024 Micheal Armstrong falsely reported to the EEOC that he has been racially discriminated against. As he alleged before he was hired and started work a part time high school employee called him by a racial name. He said he reported it to the General Manager who did not do anything. The General Manager and all other managers state that no persons' had told them that this ever occurred. There is no text, email or chat that makes any reference to these alleged events either by Michael Armstrong, any employee or any management personnel.

There is several disputes

1. Mr. Armstrong alleged that the 17-year-old part-time fry cook who had worked there for two years without incident called Mr. Armstrong a N-word on more than one occasion.

2.   The dispute is no one else heard this on any occasion. The Kitchen is very close in workspace. The Kitchen Manager was never informed by Mr. Armstrong either in person, by text, by group chat or by any other method.

3.   Again, the dispute is that Mr. Armstrong said he went to the General Manager and said something about this. The General Manager denies ever knowing or being told that this happened or he would have addressed the situation. Again, same as the kitchen manager, he was never told in person, by text, by group chat or by any other method

4. Three months after Mr. Armstrong walked out of the Kitchen Mr. Armstrong filed with the EEOC stating alleging during his shift/service in which he was kitchen lead, because he did not want to assist in

cleaning his station grill station, he walked out unknown to the General Manager. The General Manager had asked him to step to his station and instead he went to the dishwash station. The General Manager jumped in and took over Mr. Armstrong station. Mr. Armstrong was nowhere to be found. The General Manager had to watch the security footage to see him walk out.

The Dispute here is Mr. Armstrong stated that The General manager fired him after he questioned him on why he did not hold a meeting or speak to the boy who called him a name. The General Manager says that there was never such a conversation. The general manager points to the email sent by Mr. Armstrong 3 hours after he left the restaurant discussing only the cleaning of the restaurant and his actions or lack of actions. There was no indication or mention of being fired or leaving due to any racial motivated or hostile behavior, environment.

DEFENDANT CLAIMS:

Defendant claims that Plaintiff alleged action's never occurred. Defendants asserts that the Plaintiff is attempting to fraudulently scam small employers because as he told one employee "It's cheaper to settle with them then to go to court".

Defendant seeks the following Damages:

1.. Damages for reputation of Breaux Holdings L.L.C. d/b/a Birdie's Wings.

2). A finding from the Jury that Breaux Holdings, A/k/a Birdies Wings did not discriminate against its former employee.

3.) A finding that Michael Armstrong acted fraudulently in its accusation of Breaux Holdings L.L.C.

4.) A order establishing general damages for attempting to damage the professional reputation for no less than the nominal sum of $25,000.

**As discussed at the August 6, 2024 Pretrial Conference, Defendant's Counterclaim is for attorney's fees for the filing of a frivolous action. Issues of fraud and related damages will only be before the Jury if Defendant is granted leave to amend the Counterclaim.**

5.) An award of Attorney fees, court cost, and litigation expenses amounting to no less than $45,000.

**Defenses:**

1. Summons in this action was based in the Northern District of Alabama. There has been no motion allowing the summons to be amended under 4(a)(2).

2. Service for either Defendant was not perfected. Service was placed in the hands of a 13-year-old who was preparing to walk to her bus.

3. For Good Cause Defense - Petitioner were never told supervisor or General Manager of any racial complaints, or hostile work environment.

4.  Affirmative Defense of *Faragher-Ellerth-Burlington Industries v. Ellerth*: The Employer exercised reasonable care to prevent and promptly correct any harassing behavior, and Michael Armstrong unreasonably failed to take advantage of any preventative or corrective procedures.

**Defenses regarding service have been adjudicated by the Court and cannot be reasserted before the Jury. See Doc. No. [32].**

4912-8326-2554, v. 1

## Attachment E - Stipulated Facts

Based on the documents, this section indicates "N/A" - no facts have been stipulated by the parties.

4912-8326-2554, v. 1

## Attachment F-1 - Plaintiff's Witness List

**Witnesses Plaintiff will have present at trial:**

- Michael Armstrong (Plaintiff may be contacted via the undersigned)

**Witnesses Plaintiff may have present at trial:**

- Raquel Woffolk, Plaintiff's wife

- Latavius Randle, Plaintiff's best friend, 404-376-8461

- Jordan Sanchez

- Rhonda Breaux, 51% owner of Breaux Holdings

Plaintiff objects to Defendant's late identification of an "expert witness" in its proposed pretrial as Defendant chose not to make any expert disclosures during discovery, to identify an expert in discovery and has still not provided an expert report or other disclosures required by the federal rules. To the extent a private investigator could be called as an expert witness to any issue in this case, Plaintiff would be unduly prejudiced by this late disclosure.

 **To the extent Defendant seeks to call a witness not timely disclosed to Plaintiff, whether expert or fact witness, Defendant shall file a properly supported motion no later than August 7, 2025 at 5:00 p.m. In the event a motion is filed, Plaintiff shall have through August 11, 2025 at 5:00 p.m. to file a response. No reply brief will be allowed.**

## Attachment F-2 - Defendant's Witness List

**Witnesses Defendant will have present at trial:**

- Matthew Devane-Breaux (1239 Carriage Trial, Norcross, GA)

  General Manager

- Maria VU bookkeeper

**Witnesses Defendant may have present at trial:**

- Nathan McBain (2763 Big Texas Valley Road ,Rome, GA 30165)

  Kitchen Manager

- Abigail Arendall (500 Williams Drive, Apartment 1105, Kennesaw, GA)

  Front Manager

- Malia Moore (4689 Dallas-Acworth Hwy, Dallas, GA 30132)

- Ruben Ceballos (2383 Favor Road, Sw, Marietta, GA 30060)

Expert Witness- Jason Lanyan-Expert Witness Private Investigator

404-556-4596

4912-8326-2554, v. 1

**Attachment G-1 - Plaintiff's Document List**

| Trial Exhibit # | Description | Date |
|---|---|---|
| 1 | Position Statement with exhibits | 11/25/2024 |
| 2 | Email from Indeed | 11/30 |
| 3 | Text messages (2 people) | 1/3/2024 - 1/18/2024 |
| 4 | Text with Mike | 12/5/2023 - 1/18/2024 |
| 5 | Text with Matt | 12/13/2023 - 12/30/2023 |
| 6 | EEOC Charge | 2/29/2024 |
| 7 | Pay Records 12.24.23-1.6.24 | 12/24/2023 - 1/6/2024 |
| 8 | Schedule | 12/2023 - 1/2024 |
| 9 | Pay record 12.1.23-12.23.23 | 12/10/2023 - 12/23/2023 |
| 10 | Texts with Matt | 12/1/2023 - 01/03/2024 |
| 11 | Texts with Maria | |
| 12 | Video of Work Conditions | 01/03/2024 10:37 AM ET |
| 13. | Group Chat Text Messages | |
| 14. | Videos from Birdie Wing's TikTok page | |

4912-8326-2554, v. 1

Plaintiff reserves the right to use any exhibits identified on other exhibit lists

*Plaintiff objects to Defendant's documents 18 & 25. Document 18 is not an exhibit to Plaintiff's deposition, not admissible, had not been disclosed in discovery, has not been produced and is not admissible evidence. Document 25 is not relevant, admissible, nor was it produced in discovery.*

*Plaintiff also demands that Defendant produce the text messages from the group chat at the restaurant from December 2023 to January 2024.*

*Plaintiff also objects to Document Numbered #25 Resume, which was first identified in the pretrial order today at 7:31, was not produced and is not relevant.*

**Objections to exhibits will be addressed through rulings on motions in limine or at trial.**

## Attachment G-2 - Defendant's Document List

| Trial Ex. # | Description | Date |
|---|---|---|
| 1 | Resume from Indeed Michael Armstrong | 11/2023 |
| 2 | EEOC Charge of Discrimination | |
| 3. | Text between Plaintiff and Respondent Devane Breaux | 12/04/23 |
| 4. | Text between Plaintiff and Respondent Devane Breaux | 12/20/23 |
| 5. | Text between Plaintiff and Respondent Devane Breaux | 12/22/23 |
| 6. | Text between Plaintiff and Respondent Devane Breaux | 1/03/24 |
| 7. | Text between Plaintiff and Respondent Devane Breaux | 1/11/24 |
| 8. | Text between Plaintiff and Respondent Devane Breaux | 1/15/24 |
| 9. | Text between Plaintiff and Respondent Devane Breaux | 1/16/24 |
| 10. | Text between Kitchen Manager and Maria Vu | 1/04/24 |
| 11. | Text between Kitchen Manager Natan and Respondent Devane Breaux | 1/04/24 |

| | | |
|---|---|---|
| 12. | Paycheck hours Armstrong | 12/10/23-12/23/23 |
| 13. | Paycheck hours Armstrong | 12/24/23-01/06/24 |
| 14. | Weekly Kitchen Schedule | |
| | | 12/4-12/10 |
| 15. | Weekly Kitchen Schedule | 12-8/12-14 |
| | | 12-15/12-28 |
| 16. | Weekly Kitchen Schedule | 12-29/12/31 |
| 17. | Weekly Kitchen Schedule | 1-1-24/1-7-24 |
| 18. | Chart from /deposition | Of Michael Armstrong |
| 19. | Video of kitchen and employees | |
| 20. | Text between Nathan and Matt | 1/4/2024 |
| 21. | Group text Nathan ,Matt,Maria | 1/4/2024 |
| 22. | Mike text to Matt | 12/20/2023 |
| 23. | Text of hire date | 12/5/2023 |
| 24. | Michael Armstrong text | 11/30/2023 |
| | Applied for Line Cook | |
| 25. | Resume for Private Investigator Jason Lanyon | |
| 25 | Private Investigator Report | |

## Attachment H-1 - Plaintiff's Trial Brief

Plaintiff will file a trial brief one week before trial, based on any questions raised by the Court at the pretrial conference, particularly as it relates to the arguments raised by the Defendant in its "trial brief" that are 1) not grounded in the law of this case, 2) not based on the standards for a jury trial in a discrimination case, 3) were not raised as affirmative defenses in the case.   Additionally, to the extent that Defendant continues to include Plaintiff's deposition testimony, Plaintiff objects to its inclusion in the pretrial order or at trial.

**Trial briefs are not required, but if a Party wishes to submit a trial brief, it shall be filed no later than August 19, 2025. No responses will be permitted.**

4912-8326-2554, v. 1

## Attachment H-2 - Defendant's Trial Brief

A trial brief will be submitted one week prior to trial.

**Trial briefs are not required, but if a Party wishes to submit a trial brief, it shall be filed no later than August 19, 2025. No responses will be permitted.**

*Plaintiff objects to the inclusion of these deposition clips in the Final Consolidated Pretrial Order.*

Defendant's intended use of Deposition Clips for Impeachment Testimony

PARAGRAPH 19 DEPOSITION CLIPS

**Defendant may not introduce into evidence portions of Plaintiff's deposition as designated. <u>See</u> August 6, 2025 Order for instructions on use of depositions for impeachment. Doc. No. [40].**

16   A   Ma'am, I -- I done went through that already.

17   Q   What was your brother's name?

18   His name is Bennie White.

19   Q white?

20   A Yes.

21   Q   How old was he?

22    A I think he was 47, 48.

23   Q   Did he die of?

24   A   Cancer.

25   Q   Oh, I'm so sorry.  What funeral home?

115

1   A   I don't remember that, ma'am.

2   Q   What city?

3   A   It was in New Orleans.

INDEED RESUME -WORK

*Page 14 Lines 15-21*

15   2016, which picks up from the last --

16  A   Uh-huh.

17  Q   -- date that you had when you worked at Copeland's.

18  A   Uh-huh.

19  Q   From March 2016 to April 2018 --

20  A   Uh-huh.

21  Q   -- it says that you did auto detailing.


*Page 18 Lines 5-16 Indeed just putting it on there*

5   Q   Okay.  So the next thing on the list --

6   A   Uh-huh.

7   Q   -- is Chapel Hill Golf Course, Douglasville,

8   Georgia.

9   A   Uh-huh.

10  Q   You worked there from January 2017 to May 2019?

11  A   Uh-huh.

12  Q   Is that correct?

13  A   I don't know.  Honestly, when I was doing this

14  profile on Indeed, I was just putting it on Indeed.  I

15  didn't know exactly these dates, but I was just -- to

16   the best of my knowledge

16 A   Uh-huh.

17   Q   -- date that you had when you worked at Copeland's.

18   A   Uh-huh.

19   Q   From March 2016 to April 2018 --

20   A   Uh-huh.

21   Q   -- it says that you did auto detailing.

*Page 18 Lines 22-25 Highgrove Partners (to present)*

22   Q   Sous-chef.  And where did you go after that?

23   A   I don't remember.

24   Q   Well, it says that you were assistant supervisor of

25   HighGrove Partners –

*Page 19-Line 7 through Page 22 line 18 still doing landscaping while at Birdies, makes $1600 per month more if in season*

7   you're still working there --

8   A   No.

9   Q   -- according to your --

10   A   No.  That's -- that thing is old.  That -- I have

11   never updated that.  That's why I'm saying this -- this

12   is an old profile.

13   Q   So when Matt hired you in 2023 --

14   A   Uh-huh.  Yes.  I'm sorry.

15   Q   -- were you still working at Chapel Hill Golf

16   Course?

17   A   No.

18   Q   Okay.  Where were -- where were you working then?

19   A   At this time, I was doing landscaping for myself.

20   Q   For yourself?

21   A   Uh-huh.

22   Q   What's the name of your company?

23   A   Impressive Touch Landscaping Service.

24   Q   Wait.  Let me write it down.

25   A   Impressive Touch Landscaping Service.

20

1  Q   Is that something you like to do?

2  A   It's okay.

3  Q   Do you have clients that are, like, lined up?

4  A   I have customers, yeah.

5  Q   You have customers.  And they're frequent

6  customers?  They -- you go every month to do their lawn

7  and --

8  A   Yeah.

9  Q   How many customers do you have?

10  A   I don't know.  I don't know exactly.  I'd say maybe

11  seven, eight at the most.

12  Q   What do -- what do they pay per month?

13  A   It -- it all depends.  It varies on what they're

14  getting done.  Like, some people get their grass cut.

15  Some people want the bushes done, the gutters done.  It

16  just varies.

17  Q   Okay.  Give me an idea.  I -- I have no clue.  I

18  know what my guy charges me.  But I don't know --

19  A   Well, I charge -- it depends on the size of the

20   yard as well.

21   Q   Uh-huh.

22   A   So I go by the size of the yard, how often you're

23   getting the yard cut, if you're getting it cut every

24   week, every two weeks.

25   Q   Uh-huh.

                              21

 1   A   It -- it just varies in price.

 2   Q   Okay.  So let's take customer number one.

 3   A   Uh-huh.

 4   Q   The one that makes you do the most work --

 5   A   Uh-huh.

 6   Q   -- how much are you charging that person?

 7   A   I mean, I -- mostly, I charge my customers to -- if

 8   I'm doing a lot of work, I'm normally doing the bushes

 9   and cutting the grass, I'd probably charge, like, maybe

10   100 bucks, 120.

11   Q   Per time?

12   A   Yeah.  But I don't do the --

13  Q   And you do it twice --

14  A   I don't do the bushes all the time.  I probably do

15  that once every two, every three months.

16  Q   So an average customer would pay you about $200 for

17  the bushes, and then the next time you come, it's just

18  to cut the lawn?

19  A   Yeah.

20  Q   So it's about 200 a month?

21  A   Close to it.

22  Q   So -- and you have eight customers, so it's about

23  1,600 a month?

24  A   Yes.

25  Q   Okay.  Now, when you were working at Birdies'

22

1  Wings --

2  A   Uh-huh.

3  Q   -- which is owned by Breaux Holdings --

4  A   Uh-huh.

5  Q   -- were you -- did you still have your landscaping

6  business?  Because this looks like it's a long-term

7  kind of thing.

8  A   Yeah.

9  Q   You did?

10  A   Yeah.

11  Q   Okay.  And you still had -- in 2024 after you left,

12  you still had your customers?

13  A   Yeah.  But at this time, I had lost a couple of my

14  customers.  A couple of them had passed away, and a

15  couple of them went with other services.

16  Q   Okay.  But you still have eight customers?

17  A   Now I do.  I do.  I kind of got my customers back,

18  a few customers back.

*Page 31 Line 13-24 could be more during season*

13  Q   How much were you earning a month for yourself?

14  A   It -- it varies.  Depends on what the customer

15  wanted.  But probably, in a month's time, maybe 15-,

16  1600.  It could have been more depending on what they

17  want done.

18  Q   Okay.  And that's a business you still have?

19  A   I just do, like, little side stuff on the -- on the

20  side.

21  Q   What type of equipment do you have?

22  A   Lawn equipment.

23  Q   Tell me.  Like, zero-turn?  Or...

24  A   I got rid of my zero-turn.  I have walk-behinds

*Page 24 – Line 6-10 The resume was old he used with Matt*

6   A   That resume is old.  If you look at when it was

   7   made, that resume is old.

   8   Q   Did you tell Matt that this was an old resume?

   9   A   I don't -- I don't remember us having a – a

   10   conversation about the resume.

*Page 25- Line 19 through Page 26 line10 Who did he work for deceiving*
*hiring decision Manager during hiring process*

m 18   Q   But you didn't work since May 2019 at Chapel Hill.

   19   A   Uh-huh.

   20   Q   He hired you in 2023.  So you told him you were

   21   currently a chef at Chapel Hill?

   22   A   I didn't say I was currently there.  I told him I

   23   was a chef and that I worked at Chapel Hills Country

   24   Club.

   25      Q      Did you tell him you quit at Chapel Hill?

26

   1   A   No.

2  Q   Did you tell him you were fired at Chapel Hill?

3  A   No.

4  Q   Why did he believe -- think you left at Chapel Hill

5  to come apply to Birdies' Wings?

6  A   I don't know why he -- he believed nothing.

7  Q   He didn't ask you any of those questions?

8  A   Not really.  He just looked at my resume and said

9  that he liked my resume and that he liked me and that

10  he was going to give me an opportunity.

FOR WHO DID MICHAEL ARMSTRONG WORK FO2019-2023

*Page 24 lines 14-18 I don't remember*

14  Q   You don't remember who you worked for from 2019 to

15  2023?

16  A   I don't remember.  I -- I'm -- when I was making

17  that profile, I was trying to get it as accurate as I

18  can just to put in for applications.

*Page 25 lines 9-12*

9  Q   From 2019 to 2023, December 2023 --

10  A   Uh-huh.

11  Q  -- did you work at any restaurants?

12  A  I don't recall.

*Page 26 Lines 13-25*

m 13  Q  Uh-huh.  But I'm having a problem believing that

14  you have a five-year memory gap.  Were you in an

15  accident?

16  A  No.

17  Q  Did you get hit in the head?

18  A  No.

19  Q  Do -- are you on medication?

20  A  No.

21  Q  Is there any reason why you can't remember where

22  you worked at for those five years?

23  A  I'm not saying it's a reason why.  I said I just

24  don't recall, because when I was putting that resume

25  together, again, I was just trying to make it look good

*Page 27 Lines 3-10 always had a second job*

3  Q  Okay.  I'm not talking about these jobs.  I'm

4912-8326-2554, v. 1

4   trying to find out what you did from 2019 to 2023.

5   A   I know that I was doing my landscaping.  I started

6   in 2021, so I was doing that since then on the side.

7   Now, if I had another job, I would have a side job or

8   something.

9   Q   So you always had a second job?

10   A   Yes.


*Page 27 Lines 14-25 Reflecting on who he worked for*

14   Q   What would it take to reflect -- you know, give you

15   a memory -- what -- did you file taxes during that time

16   period?

17   A   Yeah.

18   Q   And did anybody that you worked for give you a W-2

19   or a 1099 to file taxes?

20   A   Yeah.  I don't -- just don't remember.

21   Q   So you could look back at your tax returns and then

22   tell me who you worked for during those five years?

23   A   Yeah.  If I had to.

4912-8326-2554, v. 1

24      MS. KUNKLE:  Amanda, could we arrange that?

25      MS. FARAHANY:  No.

A REASON WHY

*Page 28 line2 – Page 29 Line 9*

2  Q   Is there a reason why you're not telling me who you

3  worked for during that time period?

4  A   No, there's not.

5  Q   Did you ever sue another employer?

6  A   Another who?

7  Q   Did you ever sue another one of your employers?

8  A   I had a settlement with one of my employers.

9  Q   Who was that?

10  A   It was with MobilityWorks.

11  Q   Who?

12  A   MobilityWorks.

13  Q   Where are they out of?

14  A   Kennestone.

15  Q   How long did you work there?

16  A   Oh, probably about a year.

17  Q   And what did you do there?

18  A   I was the person who took care of all the cars,

19  like line the cars up, make sure the cars were details.

20  I was like a porter.

21  Q   Okay.  And did you actually physically sue them?

22  Were they sued, or did you just threaten to sue them?

23  A   I never threatened anyone.

24  Q   How did you get a settlement?  Did you have a

25  lawsuit?

                          29

 1  A   I was being racially called names, brought it to

 2  my -- brought it to my boss, and he didn't do nothing

 3  because they were friends.

 4  Q   And when was that?

 5  A   I don't even remember exactly what day.

 6  Q   What year?

 7  A   Probably 2021 or '22.  I don't remember.

8   Q   How much did you get?

9   A   I ended up with, like, 60 grand.


*Page 33 Line 7-through Page 36 Line*


7   Q   At that date or any time after that date, have you

8   applied for unemployment?

9   A   No.

10   Q   Why not?

11   A   I just didn't.  I never -- I only applied for

12   unemployment once, and it was when Katrina hit.  But I

13   never applied for unemployment since.

14   Q   Did you go to any temp service to see if you could

15   get a job temporary -- a temporary job?

16   A   No.

17   Q   Did you go to any employment agency?

18   A   No.

19   Q   Did you go by the labor board or the unemployment

20   board to see any job openings?  Because they have lists

21   and lists of job openings.

22   A   Not that I remember.

23   Q   Did you go online to look at any of their job

24   openings?

25   A   Of course.  That's the only place -- these days,

         34

1   you have to go online to get a job.  Mostly, people

2   don't have applications.  When you go in and ask for an

3   application, they tell you, go online.

4   Q   Unemployment has books, and they also are online.

5   So did you do either one of those at the -- from the

6   unemployment office?

7          MS. FARAHANY:  Object to form.

8          THE WITNESS:  Not that I remember.

9   BY MS. KUNKLE:

10   Q   Okay.  When was the first time you applied for

11   employment after you left the job?

12   A   I -- honestly, I don't remember.  I just went back

13   to dealing with my customers.

14   Q   You just went back to lawn care?

15   A   Yeah.

16   Q   And I saw -- I think I saw somewhere where you

17   applied to Walmart?

18   A   I put in a lot of applications.  I mean, going just

19   online, you fill out applications.  And --

20   Q   Do you have a list of those online applications --

21   A   No.

22   Q   -- or copies of them?

23   A   No.


24   Q   No.

25   A   I put in applications yesterday.  I put in

              35


1   applications all the time.

4912-8326-2554, v. 1

2   Q   When you were employed with Birdies' Wings from

3   December 5th to January 3rd, did you put in any

4   applications for any other companies?

5   A   Not that I remember.  But it's a possibility

6   because, like I say, I put in for applications all the

7   time.

8   Q   Did you interview with any other company?

9   A   No.  No.

10  Q   Were you aware that the Copeland's here absolutely

11  needs people all the time?

12  A   No.

13      MS. STAPLETON:  Object to form.

14  BY MS. KUNKLE:

15  Q   You -- were you aware that Copeland's is hiring?

16  A   No.

17  Q   Did you leave Copeland's of New Orleans on good

18  terms?

19  A   Yes.

20  Q   Could you be rehired?

21  A   Yes.

22  Q   Did you leave Applebee's on good terms?

23  A   Yes.

24  Q   Could you be rehired?

25  A   Yes.

           35

1  applications all the time.

2    Q   When you were employed with Birdies' Wings from

3    December 5th to January 3rd, did you put in any

4    applications for any other companies?

5    A   Not that I remember.  But it's a possibility

6    because, like I say, I put in for applications all the

7  time.

8  Q   Did you interview with any other company?

9  A   No.  No.

10  Q   Were you aware that the Copeland's here absolutely

11  needs people all the time?

12  A   No.

13      MS. STAPLETON:  Object to form.

14  BY MS. KUNKLE:

15  Q   You -- were you aware that Copeland's is hiring?

16  A   No.

17  Q   Did you leave Copeland's of New Orleans on good

18  terms?

19  A   Yes.

20  Q   Could you be rehired?

21  A   Yes.

22  Q   Did you leave Applebee's on good terms?

23  A   Yes.

24  Q   Could you be rehired?

25  A   Yes.

*Page 38 Line 13- through Page 39 Line 4*

TIME FOR WORK

*Page 44 Line 6-7  9 :30am*

6   Q   And what time were you supposed to be there?

    7   A   At 9:30.

*Page 44 Line 15-20 what time did you come in.*

M 15   Q   What time did you come in on that day --

    16   A   I was there --

    17   Q   -- January 3rd?

    18   A   I was there before open.

    19   Q   What time is open?

    20   A   If I'm not mistaken, 11:00.

4912-8326-2554, v. 1